# State of New York
# Court of Appeals

This memorandum is uncorrected and subject to revision before publication in the New York Reports.

No. 45
The People &c.,
    Appellant,
    v.
Robin Pena,
    Respondent.

Paul A. Andersen, for appellant.
Morgan Everhart, for respondent.

Order insofar as appealed from reversed, defendant's motion to suppress denied and case remitted to Criminal Court of the City of New York, Bronx County, for further proceedings on the accusatory instrument. The courts below erred as a matter of law in granting defendant's suppression motion. Chief Judge DiFiore and Judges Stein, Fahey, Garcia and Feinman concur, Judges Stein, Fahey and Garcia in a concurring memorandum and Chief Judge DiFiore and Judge Feinman in a separate concurring opinion by Judge Feinman. Judge Wilson dissents in an opinion, in which Judge Rivera concurs in part in a separate dissenting opinion.

Decided November 19, 2020

MEMORANDUM (concurring):

The order of the Appellate Term, insofar as appealed from, should be reversed, defendant's motion to suppress denied, and the case remitted to Criminal Court for further proceedings on the accusatory instrument.

A police officer stopped defendant's car because of a non-functioning center brake light. Defendant, who exhibited signs of intoxication, was given—and failed—a field sobriety test. Defendant was arrested and charged with operating a motor vehicle while impaired (Vehicle and Traffic Law § 1192 [1]) and two counts of operating a motor vehicle while intoxicated (Vehicle and Traffic Law § 1192 [2], [3]).

Defendant moved to suppress the evidence obtained as a result of the stop, asserting that the officer lacked probable cause to justify the seizure because, defendant argued, "operat[ing] a vehicle that has a non-illuminated middle brake light" is not a violation of the Vehicle and Traffic Law. At the suppression hearing, relying on the United States Supreme Court's opinion in *Heien v North Carolina* (574 US 54 [2014]), the People argued that the officer's belief that defendant was violating the law was "a reasonable mistake in this situation," rendering the stop permissible under the Fourth Amendment. The Judicial Hearing Officer determined that there was no ambiguity in the Vehicle and Traffic Law, and concluded that it was not "objectively reasonable for the officer in this case to mistakenly believe that a non-functioning middle brake light is a violation of the vehicle and traffic law." The suppression court adopted the Judicial Hearing Officer's findings of fact and legal conclusions in full and granted defendant's motion.

On appeal, the People raised only one substantive issue: "whether the officer's action in stopping defendant's car because of a defective middle brake light was an objectively reasonable mistake of law" (appellant's brief at 11 in *People v Pena*, 61 Misc 3d 134[A], 2018 NY Slip Op 51499[U] [App Term, 1st Dept 2018]). The Appellate Term affirmed, concluding that the officer's interpretation was "not an objectively reasonable

mistake of law" because Vehicle and Traffic Law § 375 (40) (b) is unambiguous, and a defective middle brake light does not violate the statute (*Pena*, 2018 NY Slip Op 51499[U], *1). A Judge of this Court granted the People leave to appeal (33 NY3d 1034 [2019]).

The sole issue on appeal is whether the officer's belief that defendant violated the Vehicle and Traffic Law by operating a vehicle with a non-functioning center stop light was objectively reasonable (*see People v Guthrie*, 25 NY3d 130, 136 [2015] ["the relevant question before us is . . . whether (the officer's) belief that a traffic violation had occurred was objectively reasonable"]; *see also Heien*, 574 US at 59, 61). The "ultimate touchstone of the Fourth Amendment is reasonableness" (*Riley v California*, 573 US 373, 381 [2014] [internal quotation marks omitted]). As the Supreme Court explained in *Heien*, "[t]o be reasonable is not to be perfect, and so the Fourth Amendment allows for some mistakes on the part of government officials, giving them 'fair leeway for enforcing the law in the community's protection'" (574 US at 60-61, quoting *Brinegar v United States*, 338 US 160, 176 [1949]). Accordingly, even assuming that a stop is premised upon a mistake of law, the stop may nonetheless be lawful where the officer's purported mistake was objectively reasonable (*id.* at 61; *People v Guthrie*, 25 NY3d 130, 136 [2015]).

We conclude that the officer's interpretation of the Vehicle and Traffic Law was objectively reasonable. Vehicle and Traffic Law § 375 (40) (b) mandates that motor vehicles manufactured after a certain date be "equipped with at least two stop lamps, one on each side, each of which shall display a red to amber light visible at least five hundred feet from the rear of the vehicle when the brake of such vehicle is applied." Vehicle and Traffic Law § 376 (1) (a) prohibits, in relevant part, (1) operating a vehicle "during the

period from one-half hour after sunset to one-half hour before sunrise, unless such vehicle is equipped with lamps of a type approved by the commissioner which are lighted and in good working condition"; and (2) operating a vehicle at any time "unless such vehicle is equipped with signaling devices and reflectors of a type approved by the commissioner which are in good working condition."  Vehicle and Traffic Law § 375 (19), in turn, prohibits the operation of a motor vehicle on highways or streets if the vehicle "is defectively equipped and lighted."  Taken together, these provisions could reasonably be read to require that all lamps and signaling devices be in good working condition, and that all equipment and lighting be non-defective, regardless of whether a vehicle is actually required to be equipped with those lamps, signaling devices, equipment, or lights.  Even assuming the officer was in fact mistaken on the law, it was nevertheless objectively reasonable to conclude that defendant's non-functioning center brake light violated the Vehicle and Traffic Law.[*]  Because any error of law by the officer was reasonable, there was probable cause justifying the stop (*see Guthrie*, 25 NY3d at 140; *Heien*, 574 US at 68; *see also People v Hinshaw*, — NY3d —, —, 2020 NY Slip Op 04816, *2 [2020]).

---

[*] Our colleagues' divergent views on whether a non-functioning center brake light violates the Vehicle and Traffic Law confirm that reasonable minds may differ on the proper interpretation of the law (*compare* Feinman, J., concurring op at 4 ["operating a vehicle with a nonfunctioning center stop lamp violates the Vehicle and Traffic Law"], *with* Wilson, J., dissenting op at 11 ["The VTL requires that only two brake lights, one on each side of the vehicle, must light up when the brake is applied"]).

FEINMAN, J. (concurring):

The Vehicle and Traffic Law required the center stop lamp on defendant's 2003

Dodge Caravan to be functioning.  Therefore, as defendant's center stop lamp was not

- 1 -

functioning, the officer, having probable cause to believe that the driver was committing a traffic violation, made no mistake of law in stopping his vehicle.

Vehicle and Traffic Law § 375 (19) makes it unlawful to operate a motor vehicle on any public highway unless the motor vehicle is "equipped and lighted" as provided by sections 375 and 376, and it prohibits the operation on a public highway of a motor vehicle "which is not so equipped and lighted or which is defectively equipped and lighted." Vehicle and Traffic Law § 376 (1) (b) specifically and unambiguously authorizes the Commissioner of Motor Vehicles to "promulgate rules and regulations with respect to lamps, reflectors and signaling devices, their number[,] type, design, construction, location, attachment and use on vehicles being driven, operated or parked on any public highway or street in this state." The legislature set parameters for this delegated authority by providing that, in promulgating such rules and regulations, the Commissioner "shall be guided" by the requirements of rules and regulations promulgated by the United States Department of Transportation. Section 376 (3), in turn, mandates that "[a]ll lights, signals and reflectors shall be of a type and design approved by the commissioner" of motor vehicles. Finally, Vehicle and Traffic Law § 376-a indicates that the police are authorized to take action and a complaint may be issued, based on a violation of section 375 or 376 "relating to required equipment" (*see id.* § 376-a [1], [3]-[4]).

In its statutory delegation of authority to the Commissioner to promulgate regulations in accordance with national safety standards, the Vehicle and Traffic Law thus provides the basis for the enforcement of the Commissioner's regulations concerning the lighting equipment specifically enumerated in the statute, namely, lamps, reflectors, and

signaling devices. The legislature established the policy and gave the Commissioner this extraordinary authority so that New York traffic laws concerning lamps, reflectors, and signaling devices could readily conform to and remain consistent with the federal requirements (*see* Letter from State of New York Department of Motor Vehicles, Bill Jacket, L 1971, ch 620 at 5; Department of Transportation Mem, Bill Jacket, L 1971, ch 620 at 7 [stating that the bill will allow conformity with national standards "without having to go through the legislative procedure each time the continually-changing Federal regulations are changed"]; Letter from New York State Thruway Authority, Bill Jacket, L 1971, ch 620 at 8 ["(T)his assignment was given to the Commissioner, rather than the Legislature, to permit immediate conformance with Federal requirements, thereby ensuring enforcement"]; *see also* L 1977, ch 592 [providing the Commissioner the same authority with respect to both commercial and non-commercial vehicles]; Sponsor's Mem at 2-3, Bill Jacket, L 1977, ch 592 [recognizing that "(v)ehicles of the same size, regardless of their use, constitute the same hazard on the highway and should be lit in the same manner" and stating that the bill thus "permits flexibility to conform lighting requirements for vehicles to Federal standards which are not in existence and which may be promulgated in the future"]). The legislature, in creating this regulatory scheme, recognized that federal regulations and standards on this subject are preemptive of State law (*see* 49 USC § 30103; *see also Drattel v Toyota Motor Corp.*, 92 NY2d 35, 40-41 [1998], *abrogated by Geier v American Honda Motor Co., Inc.*, 529 US 861 [2000] [discussing the text and purpose of the National Traffic and Motor Vehicle Safety Act]), and thus sought to eliminate conflicts between the Vehicle and Traffic Law and federal Department of Transportation standards

(*see e.g.* Sponsor's Mem at 2, Bill Jacket, L 1977, ch 592 ["Consistency in this area should result in better enforcement of lighting requirements"]).

Since 1986, the National Highway Traffic Safety Administration has required new vehicles to have high-mounted stop lamps on the vertical centerline (*see* 49 CFR 571.108). New York's Department of Motor Vehicles regulations are consistent with that requirement. The regulations provide that "1987 and newer passenger cars must be equipped with a high-mounted stop lamp on the vertical centerline, except those with custom as the make of the vehicle" (15 NYCRR 79.21 [e] [6]). Additionally, the regulations instruct that an inspector should reject the vehicle if the center stop lamp "does not function when [the] brake is applied" (*id.*).

Accordingly, a nonfunctioning center stop lamp is not "of a type and design approved by the commissioner" (Vehicle and Traffic Law § 376 [3]), and operating a vehicle with a nonfunctioning center stop lamp violates the Vehicle and Traffic Law (*see id.* § 375 [19]).

That Vehicle and Traffic Law § 375 (40) requires "at least two" stop lamps, "one on each side" does not negate this conclusion. Section 376 (4) specifies that, while "existing provisions" regarding the use of lamps continue to apply, they do not apply if they are "irreconcilably inconsistent" with section 376 or the regulations promulgated thereunder. To the extent the regulations requiring the third stop lamp are not mirrored in section 375's mandate for "at least two" stop lamps, the Commissioner's regulations as to the necessary lighting equipment on the vehicle still govern. Indeed, the statute's regulatory scheme does not allow for the unreasonable interpretation that the existence of

section 375 (40) cancels the mandate for more modern safety features, such as the lighting equipment required by the Commissioner pursuant to section 376, in lockstep with the national safety standards.

Further, the Commissioner's regulations pertaining to "equipment" (15 NYCRR 43.4 & 43.5 [requiring vehicles less than 80 inches in width to be equipped with two red stop lamps, one on each side of the vertical centerline]) are incompatible with the regulations regarding the mandated equipment to pass yearly safety inspections allowing a vehicle to be operated on a public highway (15 NYCRR 79.21 [e] [6]) and, in fact, have not been amended since 1980. As a result, the Commissioner's regulations for inspection standards—which, in line with the authority granted by Vehicle and Traffic Law § 376 (1) (b), are guided by the requirements of the United States Department of Transportation—set the minimum lamp equipment for vehicles. This interpretation is consistent with the legislative intent of enforcing lighting requirements matching the national safety standards (*see e.g.* Sponsor's Mem at 2, Bill Jacket, L 1977, ch 592; Bill Jacket, L 1971, ch 620 at 5-8) and promotes highway safety by encouraging driving with properly equipped vehicles (*e.g.* National Highway Traffic Safety Administration, *The Long-Term Effectiveness of Center High Mounted Stop Lamps in Passenger Cars and Light Trucks*, DOT HS 808 696 [March 1998], at vi, available at https://crashstats.nhtsa.dot.gov/ Api/Public/ViewPublication/808696 [accessed Nov. 17, 2020] [finding that, "in the long term, passenger car CHMSL (Center High Mounted Stop Lamps) reduce rear impacts by 4.3 percent" and "CHMSL will continue to be a highly cost-effective safety device"]).

Given that defendant's center stop lamp was not functioning, the vehicle stop was lawful because the officer had probable cause to believe that the driver was committing a traffic violation (*see People v Hinshaw*, __ NY3d __, 2020 NY Slip Op 04816, *2 [2020]), and defendant's motion to suppress should have been denied.

WILSON, J. (dissenting):

When Robin Pena was pulled over by a police officer, his two side brake lights were working properly; his center brake light was not. Because "an automobile stop 'is a seizure implicating constitutional limitations'" (*People v Hinshaw*, __ NY3d __, 2020 NY Slip Op

04816, at *2, quoting *People v Spencer*, 84 NY2d 749, 752 [1995]), in order to decide whether the stop of Mr. Pena's vehicle ran afoul of the Fourth Amendment, we must determine whether the legislature has authorized officers to stop vehicles solely because a center brake light is not working.

Judge Rivera and I conclude that the Vehicle and Traffic Law (VTL) does not authorize stopping a vehicle solely because its center brake light does not work. Our concurring colleagues reach the opposite conclusion. The plurality, however, cannot or will not say whether an officer may stop a vehicle because of a faulty center brake light. Instead, the plurality offers a superficially appealing answer to explain its silence on what the law means: because two judges say two lights are required, two judges say three lights are required and three judges say nothing, the statute sure is unclear, so the officer's view must be an objectively reasonable mistake if so many judges have so much difficulty interpreting the statute. That superficial answer shirks our fundamental duty to construe statutes and cavalierly treats the underlying Fourth Amendment rights.

My disagreement with the concurrence is of the garden-variety nature: we have both tried to interpret a statute and come to opposite conclusions. My disagreement with the plurality is much different. By refusing to say what the VTL permits, the plurality does not merely lead the court to the wrong result in this case. Far more important, its approach—validating police conduct as a potential "mistake" of law without saying whether the conduct was in fact a mistake of law—licenses future police conduct that may, for all the plurality knows, constitute an unlawful abridgement of the Fourth Amendment rights of motorists. The plurality also abdicates our most fundamental roles: serving as the

definitive statutory interpreter for the State of New York, and guarding the constitutional rights of those within our borders.

I

A

Judges are "selected by society to give meaning to what the legislature has done" (Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum L Rev 527, 529 [1947]; *cf.* Alexander Hamilton, *The Federalist No. 78* [1788] [as to statutes, "it is the province of the courts to liquidate and fix their meaning and operation"]).  The job of the highest court in New York State—or in any state—when faced with a question of statutory interpretation is to interpret the statute.  Sometimes, the legislature is not entirely clear in drafting statutes, or two portions of a statute say two different things, or the literal reading of a statute does not make a whole lot of sense.  Resolving those sorts of issues is the bread and butter of appellate courts.  Here, the lower courts held that driving with a non-working center brake light is not a traffic violation under the VTL provision governing brake lights, Section 375 (40) (b).  Our concurring colleagues reached a different conclusion, reading the VTL, together with Department of Motor Vehicles (DMV) regulations, to prohibit driving with a broken center brake light.  For the reasons set forth in Part II, I agree with the lower courts' reading of the VTL.

The plurality, however, refuses to say which interpretation of the VTL is correct.  It holds that "the officer's interpretation of the Vehicle and Traffic Law was objectively reasonable," without deciding whether the officer's interpretation is what the legislature set out as the law.  The plurality's dodge is to conclude that because the statutory scheme

says different things about a variety of vehicle lights at different places in the code, it is objectively reasonable for officers to stop vehicles with a nonfunctional center brake light, even if the legislature intended otherwise. That result is no different than if the plurality had decided, as the concurrence does, that the legislature made it a traffic infraction to operate a vehicle unless all three brake lights were working—except that the plurality refuses to reach any conclusion about what the legislature meant.

The plurality does not explain its refusal to state whether the officer's interpretation of the VTL was a mistake of law, but cites authorities establishing that an officer's objectively reasonable mistake of law can provide probable cause to stop a vehicle: our decision in *People v Guthrie* (25 NY3d 130 [2015]), and the U.S. Supreme Court's decision in *Heien v North Carolina* (574 US 54 [2014]). In *Guthrie*, we held that an officer had probable cause to stop the defendant based on the officer's "reasonable belief that defendant failed to stop at a valid stop sign" in violation of the VTL, though in fact the stop sign was not properly registered as required by the VTL (25 NY3d at 140). We first determined the stop was based on a mistake of law because the driver did not commit a stop sign infraction (which the People conceded), and then turned to the question of whether the mistake was objectively reasonable (*id.* at 133-134). That is the way in which we should proceed here: first, is it a violation of the VTL to drive with a defective center brake light? If it is, then, as the concurrence states, no mistake-of-law analysis is required: the stop was lawful. If it is not, we then turn to the question of the reasonableness of the mistake of law, as we did in *Guthrie*.

*Heien* held that an investigatory stop based on a reasonable mistake of law does not violate the Fourth Amendment, affirming the North Carolina Supreme Court's ruling that an officer who believed the state vehicle code required two working brake lights made a reasonable mistake of law (574 US at 68). In *Heien*, the North Carolina Supreme Court "assume[d]" for purposes of its decision that the intermediate appellate court "correctly held that [North Carolina's] General Statutes require only one brake light" because the State did not appeal the latter court's decision about what the statute required (*State v Heien*, 366 NC 271, 283 [2012]). For both procedural and jurisprudential reasons, then, the U.S. Supreme Court did not independently decide what the North Carolina statute required. The Supreme Court's reasons for refraining from deciding what a North Carolina statute meant are lacking here. No court other than ours has the power to determine conclusively how the statutes of New York are construed. Courts lacking that power and duty—whether a New York state trial court or a federal appellate court—may often have good reason to avoid construing a New York statute. We do not.[1]

Moreover, skipping past the question of whether the legislature meant to authorize stopping vehicles with two, but not three, working brake lights leads to a result wholly

---

[1] The plurality maintains that "[t]he sole issue on appeal is whether the officer's belief that defendant violated the Vehicle and Traffic Law by operating a vehicle with a non-functioning center stop light was objectively reasonable" (plurality op at 3), eliding the question framed by the People: "whether the officer's action in stopping defendant's car because of a defective middle brake light was an objectively reasonable mistake of law" (brief for appellant in *People v Pena*, 61 Misc 3d 134[A], 2018 NY Slip Op 51499[U] [App Term, 1st Dept 2018]). The issue of whether the officer was in fact *mistaken* that a nonfunctioning center brake light constitutes a traffic infraction—the question briefed by the parties at every level of this litigation—presents a pure question of statutory interpretation.

inconsistent with the Fourth Amendment and New York's constitution. Consistent with mistake-of-law jurisprudence and our judicial responsibility, to determine whether an officer's stop was lawful we must decide, first, whether the basis for the stop was a mistake of law at all, and second, only if we find the stop was based on a mistake of law, whether the officer's mistake of law was objectively reasonable. By deciding first what the law requires, and then, if an officer has misinterpreted it, whether the mistake was objectively reasonable, courts do not leave future actors—whether officers or civilians—in doubt as to what the law requires, so that no future violations of that law will be excusable as mistakes. Instead, if we approve potentially illegal vehicle stops on the basis of mistake-of-law jurisprudence <u>without determining whether a mistake of law actually occurred</u>, we prospectively sanction countless potential constitutional violations.[2]

The plurality's evasion of the threshold question leaves the reader, unavoidably, to conclude either that the plurality does not know what the VTL prohibits or that it does but is not willing to say.[3] Neither is palatable. First, however troublesome, "questions of

---

[2] In the context of qualified immunity doctrine, the U.S. Supreme Court has recognized the importance of clarifying the law for reasons that are persuasive here. For example, in *Camreta v Greene* (563 US 692 [2011]), the Court recognized that the usual policy of conferring immunity without deciding a plaintiff's constitutional claim sometimes "threatens to leave standards of official conduct permanently in limbo. … [T]he moment of decision does not arrive. Courts fail to clarify uncertain questions, fail to address novel claims, fail to give guidance to officials about how to comply with legal requirements" (*id.* at 706 [citations omitted]).

[3] If our colleagues in the plurality cast a vote one way or the other, the statute's meaning would be conclusively determined, one way or the other. That is, if the plurality would vote unanimously for two or three lights, or if it would split 2-1 in either direction, any of those results would produce a majority as to whether the VTL authorizes stopping a car solely because of a nonworking center brake light.

statutory interpretation, especially when arising in the first instance in judicial proceedings,

are for the courts to resolve" (*National Labor Relations Bd. v Hearst Publications*, 322 US

111, 130-31 [1944], overruled in part, on other grounds, by *Nationwide Mut. Ins. Co. v

Darden*, 503 US 318 [1992]).  Second, if the statute is so unclear as to defy judicial

interpretation, we would have to strike it as unconstitutionally vague (*see People v Shack*,

86 NY2d 529, 538 [1995] ["Whether a statute is unconstitutionally vague is measured by

whether it provides notice to 'a person of ordinary intelligence … that his contemplated

conduct is forbidden by the statute'"] [quoting *United States v Harriss*, 347 US 612, 617

(1954)]).

Knowing what the VTL prohibits but refusing to construe it invites chaos.[4]  If the

plurality believes that the VTL does not in fact contain a traffic infraction for driving with

---

[4] Query whether, after our Court's decision today, a police officer's decision to pull someone over for a defective middle brake light will remain reasonable going forward. Perhaps it will, because a plurality of the Court has said the statute is sufficiently ambiguous that officers could reasonably conclude that all three brake lights must work, and two concurring Judges would hold that the statute requires all three brake lights to work, though neither of positions has the force of law.  The Appellate Term held that only two must function, and that decision is controlling on trial courts in the First Department, and entitled to deference in lower courts of other departments, until we resolve the interpretation of the statute (*see People v Pestana*, 195 Misc 2d 833, 839 [Crim Ct 2003] [Criminal Court does not "deem itself bound by a decision of the Appellate Term of another judicial department, even if only to the extent that it does not conflict with the law as stated by the courts that directly bind it," but such a decision is "entitled to great deference"]).  If we decline to interpret the statute, and other departments construe the statute contrary to the Appellate Term's interpretation, I fear we may have a patchwork of outcomes, where stopping a vehicle with a nonfunctioning center brake light is a reasonable mistake of law in some parts of the state, but not in others (*see Mountain View Coach Lines, Inc. v Storms*, 102 AD2d 663, 664 [2d Dept 1984] [stating that the Appellate Division "should accept the decisions of sister departments as persuasive, (but is) free to reach a contrary result"]).

a nonfunctional center brake light, but it was reasonable for Officer Thomas to believe otherwise, then the plurality should say so. The result in Mr. Pena's case would be the same, but the Court would make clear that, in the future, vehicle stops of cars with both side brake lights working will not be excused as reasonable mistakes of law, thus preserving constitutional rights the legislature has not deemed worthy of impinging. If, on the other hand, the plurality agrees with our concurring colleagues that the VTL specifies an infraction for driving with a center brake light out, then it should so hold, advising officers and motorists alike that a non-working center brake light is an infraction justifying a vehicle stop. No resort to mistake-of-law doctrine—which is meant to be reserved for cases where an error of law has been determined to have occurred—would be needed. Under either scenario, the legislature would have no need to act if we correctly determined its intent.

Beyond the simple proposition that we should do our job and construe the VTL, doing so would provide much-needed guidance both to law enforcement officers and members of the public. Here, the question of statewide importance is not whether the stop of Mr. Pena's vehicle was reasonable, but whether anyone who drives with a broken middle brake light violates New York law.[5] Supplying a clear answer—either way—would disable

---

[5] The National Highway Traffic Safety Administration has since 1986 required new cars to be manufactured with center high-mounted stop lamps (49 CFR 571.108; *see also* 15 NYCRR 79.21 [e] [6] [incorporating the federal mandate]). The median life of a passenger car in the U.S. is about 11 years, which suggests that only a tiny fraction of the nearly 10 million passenger cars registered in New York lacks a center brake light (*see* Bureau of Transportation Statistics, *Average Age of Automobiles and Trucks in Operation in the United States*, available at https://www.bts.gov/content/average-age-automobiles-and-trucks-operation-united-states [last accessed Sept. 25, 2020]; *Vehicle Registrations in*

police officers from making any "reasonable" mistake in the future and allow drivers to conform their conduct to the law. Fundamentally, do we want officers to know the law and enforce it, or to enforce mistakes of law?

B

When our Court refuses to decide what infractions the VTL contains, or when we extend the universe of traffic infractions beyond those created by statute, we both fail to effectuate the legislature's intent and fail to establish the constitutional limits of one of the most frequent and pervasive exercises of the state's police power: the vehicle stop (*see* Elizabeth Davis et al., *Contacts Between the Police and the Public, 2015* 4 [Oct. 2018], *available at* https://www.bjs.gov/content/pub/pdf/cpp15.pdf [last accessed Oct. 23, 2020] [over 19 million drivers experienced a police stop in the U.S. in 2015]; Charles R. Epp et al., *Pulled Over: How Police Stops Define Race and Citizenship* 2 [2014] [each year about 12% of all drivers are stopped by the police, and the share of Black drivers stopped is about double]). Those limits matter. An accumulating body of research demonstrates not only the frequency with which traffic stops escalate to tragic consequences (*see* Rivera, J., dissenting op at 4), but also the extent to which traffic stops reproduce racial disparities (*see* Emma Pierson et al., *A Large-Scale Analysis of Racial Disparities in Police Stops Across the United States*, Nature Human Behaviour [2020], *available at* http://web.stanford.edu/~csimoiu/doc/traffic-stops.pdf [last accessed Oct. 23, 2020] [study of 95 million traffic stops finding Black drivers were more likely to be stopped, ticketed,

_____

*Force* [2018], available at https://dmv.ny.gov/statistic/2018reginforce-web.pdf [last accessed Sept. 25, 2020]).

searched, and arrested than white drivers, and that Hispanic drivers, when stopped, were more likely to be ticketed, searched, and arrested than white drivers]; Robert E. Worden et al., *Traffic Stops by Suffolk County Police* 7, 48 [Sept. 2020], *available at* https://suffolkcountyny.gov/Portals/0/formsdocs/police%20reform/Traffic%20Stops%20 by%20Suffolk%20County%20Police%2010.19.2020.pdf [last accessed Oct. 23, 2020] [study of over 130,000 traffic stops by Suffolk police finding that, compared to white drivers, Black and Hispanic drivers were more likely to be stopped for equipment violations, Black drivers were over three times more likely to be subjected to physical force, and Hispanic drivers were 16% more likely to be searched and 16% more likely to be arrested]; Charles R. Epp et al., *Pulled Over: How Police Stops Define Race and Citizenship* 143 [2014] [interview-based studies tracking the long-term harms of police stops have found that, "(a)mong African Americans, the more stops the driver has experienced over his or her lifetime, the less they trust the police"]). Enlarging police discretion to stop automobiles on the ground that the stop is an excusable mistake, without determining what the legislature intended, is fraught with untoward consequences.

Our concurring colleagues conclude that the DMV, with power delegated from the legislature, has determined that officers are authorized to stop vehicles solely because a center brake light bulb has burned out. Judge Rivera and I do not. But the approach of both the concurrence and the dissent is to state what the law is, so that no future Fourth Amendment violations involving center brake light failures would be excused as mistakes of law. The plurality, instead, grants unfettered discretion to police officers to stop vehicles

for a center brake light failure, deeming it unnecessary to determine what the legislature has directed.

## II

To determine whether the stop was lawful, we must decide what the VTL requires. The VTL requires that only two brake lights, one on each side of the vehicle, must light up when the brake is applied while a vehicle is being driven on a public road. VTL § 375 (40) (b), the provision specifically governing brake lights, or "stop lamps," provides:

> "[e]very motor vehicle, except a motorcycle, operated or driven upon the public highways of the state, if manufactured on or after January first, nineteen hundred fifty-two, shall be equipped with at least two stop lamps, one on each side, each of which shall display a red to amber light visible at least five hundred feet from the rear of the vehicle when the brake of such vehicle is applied"

(VTL § 375 [40] [b]). As the courts below correctly observed, the plain text requires that only (*i.e.*, "at least") "two stop lamps, one on each side," light when the vehicle is "operated or driven upon the public highways of the state" and "when the brake of such vehicle is applied." Mr. Pena did not violate VTL § 375 (40) (b) because both his left and right brake lights were working.

The plain language of VTL § 375 (40) (b) is not muddled by VTL § 376 (1) (a). Section 376 (1) (a) does not govern brake lights, or "stop lamps," as the VTL refers to them. Rather, VTL § 376 (1) (a) prescribes the "lamps" that must be continuously "lighted and in good working condition" "during the period from one-half hour after sunset to one-half hour before sunrise," namely, head lights and taillights. Because it regulates lamps

that must be "lighted" throughout the night—and only at night—VTL § 376 (1) (a) cannot

reasonably be interpreted to apply to brake lights, which necessarily only light when the

driver applies the brake, and of course must function during the day as well as at night.[6]

Moreover, even if one were to accept the view that VTL § 376 (1) (a) applies to brake

lights, the text requires only that a vehicle have "lamps" in working condition; unlike VTL

§ 375 (40) (b), it does not specify the number of lamps that must work.[7]

Finally, to the extent that equipment regulations promulgated by the Commissioner

of the DMV bear on the meaning of the VTL's equipment provisions, those regulations are

consistent with the text of the VTL, requiring only two functioning brake lights, on either

side of the vehicle.  Where (as the plurality claims) a statute is ambiguous, courts may

---

[6] VTL § 376 (1) (a) also prohibits operating a vehicle at any time "unless such vehicle is equipped with signaling devices and reflectors of a type approved by the commissioner which are in good working condition."  The People argue that any brake light could be considered a "signaling device," and therefore driving with a defective middle brake light would violate VTL § 376 (1) (a).  However, nothing in the VTL provisions (or even DMV regulations) that expressly govern brake lights indicates that they are to be considered a type of "signaling device," and the VTL nowhere defines "signaling device" to include brake lights.  The VTL does not define "signaling device" at all, but DMV regulations refer separately to "stop lamps," "tail lamps," and "directional signals" or "turn-signal lamps" (*see* 15 NYCRR 79.21 [e]; 43.4).  In addition, the People argue that ambiguity derives from VTL § 375 (19), which requires that vehicles be "equipped and lighted as provided by this section and by section three hundred seventy-six."  Again, though, VTL § 375 (19) does not alter the plain requirement of § 375 (40) (b) that "two stop lamps, one on each side," must light when the brake is applied.

[7] Thus the language of VTL § 376 (1) (a) is quite different from the language of the North Carolina statute in *Heien*, which required that "*all* originally equipped rear lamps" be functional (574 US at 59, quoting N.C. Gen. Stat. Ann. § 20-129 [d] [emphasis added]).  The U.S. Supreme Court relied in part on that language to find that the officer made a reasonable mistake of law in stopping the defendant for a defective brake light (*id.* at 68-69).

"giv[e] appropriate weight to the judgment of those whose special duty is to administer the questioned statute" (*Hearst Publications*, 322 US at 131; *see also Kurcsics v Merchants Mut. Ins. Co.*, 49 NY2d 451, 459 [1980] [when a question is one of pure statutory construction, an administrative agency's interpretive regulations are entitled to some modest weight, unless they "run counter to the clear wording of a statutory provision"]).[8] VTL § 376 (b) empowers the Commissioner "to promulgate rules and regulations with respect to lamps." The DMV's regulation on "required lighting" provides, as to "stop lamps," that there be "2 red" (15 NYCRR 43.4). Mr. Pena complied with that requirement. To be sure, the DMV's regulation on inspections, which are required by Article 5 of the VTL, provides that a vehicle will fail inspection if it is "[n]ot equipped with a high-lamp on the vertical centerline" or if the center light "does not function when brake is applied" (15 NYCRR 79.21 [e] [6]). However, an officer does not have probable cause to stop a vehicle based on observing a maintenance issue that could cause the vehicle to fail its annual inspection when the issue does not itself constitute a violation of the VTL.[9]

---

[8] The concurrence does not claim VTL § 375 (40) (b) is ambiguous. Instead, the concurrence takes an unusual and unprecedented route. It admits that the plain words of a statutory provision, VTL § 375 (40) (b), require "at least" two functioning brake lights, one on each side, but then disregards the clear statutory language by pointing to two DMV regulations that the concurrence itself identifies as "incompatible" with each other as to the number of working brake lights required. The concurrence then disregards as obsolete the DMV's 2-light regulation, though it remains a regulation in force, and uses the remaining regulation to override the statute.

[9] VTL § 375 (40) (b) requires drivers to maintain two functioning brake lights, "one on each side," at all times, but the VTL does not otherwise provide that it is unlawful for a vehicle's lights to fall out of compliance with maintenance inspection standards in between required inspections. Therefore, observing a maintenance issue that would cause a vehicle to fail inspection does not, on its own, provide probable cause to believe

Relying largely on DMV regulations governing safety inspections, the concurrence concludes that driving with a non-lighting center brake light is a VTL violation and thus the officer "made no mistake of law in stopping [Mr. Pena's] vehicle" (concurring op at 2). There are two fatal problems with the concurrence's approach. First, VTL § 376-a grants police officers the power to issue a summons only for a "violation of any provision of section three hundred seventy-five, three hundred seventy-six or three hundred eighty-one" of the VTL—not for violations of the DMV's regulations. The fact that VTL § 376 (1) (b) authorizes the Commissioner to promulgate regulations does not transform a violation of a regulation into a violation of the VTL.

Second, the concurrence conflates a set of requirements for the equipment and inspection of vehicles, on the one hand, with the set of offenses that provide a lawful basis for the police to stop a vehicle, on the other.[10] The question before our Court is not whether Mr. Pena's vehicle was manufactured with the requisite number of brake lights (it was), nor whether the defective brake light that the officer observed could cause Mr. Pena's vehicle to fail an inspection based on DMV regulations (it could); the question is whether

---

the driver violated the VTL. The record does not indicate, and the People do not allege, that the officer observed on Mr. Pena's car an invalid inspection sticker in violation of VTL § 306.

[10] The legislature has clearly established that the standards for what equipment must be present on a car and in working order, on the one hand, and what equipment deficiencies authorize an officer to stop a moving vehicle, on the other, are different. For example, Section 375 (35) (c) provides that "[n]o person shall operate a motor vehicle or a trailer on a public highway if such vehicle is equipped with tires that do not meet the standards established by the commissioner pursuant to paragraph (a) of this subdivision" (VTL § 375 [35] [c]). Section 375 (40) (b) does not similarly define a traffic infraction by express reference to DMV standards.

operating a vehicle with a nonfunctioning center brake light is violation of the VTL as defined by the legislature (it is not).

As the concurrence notes, the legislature has empowered the DMV Commissioner to promulgate regulations with the aim of "conform[ing] vehicle lighting regulations to Federal requirements" (Sponsor's Mem, Bill Jacket, L 1977, ch. 592 at 7).[11] The Commissioner has promulgated inspection regulations to that end, including the aforementioned requirement that vehicles manufactured since 1987 must be "equipped" with a center brake light, which must function in order to pass inspection (15 NYCRR 79.21 [e] [6]). However, the legislature has not amended VTL § 375 (40) (b) to require drivers operating a vehicle on a public road to have a functioning center brake light, and thus the statute does not empower officers to stop a vehicle solely for a defective center brake light.

---

[11] The concurrence's references to legislation enacted in 1971 are inapt; unlike the 1977 bill, the 1971 bill dealt solely with the VTL's lighting requirements for "commercial vehicles and non-commercial trailers," not passenger vehicles (Letter from State of New York Department of Motor Vehicles, Bill Jacket, L 1971, ch. 620 at 5). In any event, as the concurrence notes, federal law preempts State law with regard to "motor vehicle safety standard[s]" (49 USC § 30103), defined as "a minimum standard for motor vehicle or motor vehicle equipment performance" (49 USC § 30102 [a] [10]). Clear from both the 1971 and 1977 legislative history is that because federal standards governing automobile equipment would displace any conflicting state standards, the legislature tasked DMV with continuously conforming New York's requirements to federal standards to avoid legislative action each time a federal safety standard changed. Although federal regulations establish equipment standards, federal automobile equipment standards do not determine what any state legislature will decide warrants stopping a vehicle.

Contrary to the concurrence's view, then, the statutory mandate of "at least two" brake lights (VTL § 375 [40] [b]) is not "irreconcilably inconsistent" with DMV regulations promulgated under section 376 (VTL § 376 [4]). The regulations prescribe the lights with which vehicles must be equipped and which lights must work to pass inspection; the statute sets out how many lights must work when a driver operates a vehicle on public roads. However, by suggesting that DMV regulations "govern" to the extent they appear to conflict with the relevant statute (concurring op at 4), the concurrence proposes a novel and dangerous theory that by authorizing the DMV to promulgate safety equipment regulations in harmony with federal regulations, the DMV is empowered to modify the legislature's own statute determining when officers have probable cause to stop a vehicle.

\*       \*       \*

The correct result here is to hold that the stop was not supported by probable cause because the legislature has not authorized the stop of a vehicle with two working brake lights, one on each side, and that the officer's error was not objectively reasonable. A tolerable, though incorrect, result would be to hold that the stop was based on a mistake of law but the mistake was reasonable; another tolerable though incorrect result would be the position of the concurrence. The only incorrect and intolerable position is that held by the plurality—that the Court of Appeals is not going to say whether the stop here was or was not authorized by the legislature, but instead is a mistake worth repeating.

RIVERA, J. (dissenting):

The prosecution appeals from the Appellate Term's order affirming the suppression of all evidence stemming from an illegal traffic stop of defendant Robin Pena's vehicle. Rather than address head on what the Vehicle and Traffic Law (VTL) requires, three members of the Court engage in a mistake of law analysis without first identifying whether

- 1 -

the officer actually misunderstood the law. Two other members of the Court concur with the plurality in reversing the Appellate Term's decision, but on the grounds that the VTL— as read through the lens of the Department of Motor Vehicles' safety inspection regulations—requires three working break lights. I cannot join either opinion as both are wrong on the law.

I fully join Judge Wilson's dissent that the Court should resolve the VTL question presented in this appeal before embarking on a mistake of law analysis (Wilson, J., dissenting op at 3-9). The plurality's failure to say what the VTL means leaves motorists, law enforcement officers, and judges wondering what the law requires. This outcome does nothing to promote the law's development or ensure the safety of the public (*id.* at 8-11).

I agree with Judge Wilson's analysis of the statutory provisions at issue in this appeal. The VTL required that defendant's vehicle be equipped with two functioning brake lights, one on the left and one on the right (*id.* at 11-16). No more, no less. While a motor vehicle may fail the annual safety inspection because of a nonfunctioning middle brake light, that fact does not provide grounds for a Fourth Amendment seizure (*id.*). Therefore, the courts below properly concluded that the officer had no probable cause to stop defendant.

Even if I agreed with the plurality that certain provisions of the VTL inject ambiguity into the analysis and suggest that a vehicle's middle brake lights, no matter the number, must be in good working condition, I would still affirm. First, as I explained in my dissent in *People v Guthrie* (25 NY3d 130, 148-49 [2015]), under New York's

Constitution, an officer's mistake provides no basis to deny a defendant's motion to suppress evidence recovered during an illegal seizure. An ambiguous law is not a sufficient justification to relax our constitutional protections.

Second, *Guthrie* is sui generis. The case involved an officer who stopped the defendant for running through what turned out to be an invalid stop sign (*id.* at 132). The officer did not know the registration status of every stop sign in the Village Code, and so mistakenly believed that the sign was valid and therefore stopped the defendant for her apparent violation of the VTL. That is a markedly different case from the instant appeal, where the officer mistakenly believed that defendant's vehicle was not adequately equipped under the VTL based on a misunderstanding of the VTL's requirements. It is one thing to admit evidence against a defendant collected during an illegal stop based on an officer's failure to confirm in advance that a stop sign was properly registered under local law; it is quite another to excuse an officer from knowing whether the VTL requires two or three operating brake lights. The rule adopted in *Guthrie* as applied to the facts of that case might seem socially acceptable—after all, the motorist ran a stop sign that was identical to any other, which, in most situations, would be illegal. But extending *Guthrie*'s rule to the circumstances presented here encourages illegal stops—it makes a bad rule worse. As I have previously explained,

> "[w]e should not excuse an error about the basic foundation of an officer's power, or discourage better comprehension of it. Moreover, if, as the majority concludes, we cannot depend on an officer charged with enforcement powers to know the law, we place in question the integrity of our criminal justice system. That strikes me as an unacceptable outcome of the majority's approach" (*id.* 148).

Now, under the plurality's new, expanded mistake of law rule, a court may suppress only that evidence gathered during a stop that the officer knows to be invalid. But why incentivize mistaken, unlawful stops?[*] Instead, why not reject a rule that increases the opportunity for potentially dangerous and life-threatening encounters between armed officers and innocent motorists? It is now well understood that law enforcement interactions with the public can escalate unnecessarily with dire consequences. According to a study released by the Department of Justice's Bureau of Justice Statistics in 2013, 6% of a sample of drivers "pulled over in traffic stops experienced some type of force used against them, from shouting and cursing, to verbal threats of force or other action, to physical force including hitting, handcuffing, and pointing a gun" (Lynn Langton, Matthey Durose, & US Dept of Justice, *Police Behavior During Traffic and Street Stops, 2011* 10 [Rev October 27, 2016], *available at https://www.bjs.gov/content/pub/pdf/pbtss11.pdf* [last accessed November 2, 2020]). In 2015, more than 100 people were shot and killed by police after traffic stops (Wesley Lowery, *A disproportionate number of black victims in fatal traffic stops*, Washington Post [Dec. 24, 2015], https://www.washingtonpost.com/national/a-disproportionate-number-of-black-victims-in-fatal-traffic-stops/2015/12/24/c29717e2-a344-11e5-9c4e-be37f66848bb_story.html; *see also* Allegra M. McLeod, *Police Violence, Constitutional Complicity, and Another Vantage*, 2016 Sup Ct Rev 157, 162 [2016] ["Increased exposure to (traffic) stops increases

---

[*] The exclusionary rule, at its core, is a method of deterrence (*People v Payton*, 51 NY2d 169, 175 [1980]). It protects not only the rights of the accused but, through its operation in criminal cases, yours and mine as well.

the risk that encounters will escalate to the sort of violence that led to Philando Castile's death"]; Abby Ohlheiser & Abby Phillip, *'I will light you up!': Texas officer threatened Sandra Bland with Taser during traffic stop*, Washington Post [July 22, 2015 at 4:26PM], https://www.washingtonpost.com/news/morning-mix/wp/2015/07/21/much-too-early-to-call-jail-cell-hanging-death-of-sandra-bland-suicide-da-says/ [detailing how Sandra Bland, who died in police custody, was threatened and assaulted after an officer stopped her for a minor traffic violation]).

If we are going to adopt a per se rule, we should choose one that minimizes illegal stops by requiring suppression in every case where the officer acts without authority under the law. That would further public safety by incentivizing officers to know the laws that they are obligated to enforce and ensure that motorists who comply with the rules of the road do not have to fear being pulled over for no good reason.